MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2014 ME 79
Docket:      Han-13-345
Argued:      May 13, 2014
Decided:     June 17, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

DAN BROWN

ALEXANDER, J.

[¶1]  The State of Maine allows the direct sale of unpasteurized, or "raw,"
milk from farmers to consumers.  Dan Brown, a farmer in Blue Hill, has sold raw
milk, dairy products, and other food items from a farm stand on his property and at
local farmers' markets.  Despite requests by the State, Brown has refused to obtain
a milk distributor's license, refused to obtain a food establishment license, and
refused to label his milk containers to advise consumers that they contain raw,
unpasteurized milk.  Brown contends that he is exempt from state licensing
requirements because, eight years ago, a state official told him that he did not need
a license to sell milk; because bringing his milk production facility into compliance

2

with state sanitation standards is too expensive; and because the Town of Blue Hill

enacted an ordinance exempting him from compliance with state licensing laws.[1]

[¶2]  After considerable efforts to encourage Brown's compliance, the State

brought a complaint against Brown for violations of state licensing and labeling

laws.  Following a hearing, the Superior Court (Hancock County, *A. Murray, J.*)

entered a summary judgment determining that Brown unlawfully sold milk without

a milk distributor's license as required by 7 M.R.S. § 2901-C(1) (2013); sold raw,

unpasteurized milk in containers that were not labeled "not pasteurized" as

required by 7 M.R.S. § 2902-B(1) (2013); and operated a food establishment

without a license as required by 22 M.R.S. § 2167 (2011).[2]  For Brown's

violations, the court imposed civil penalties totaling $1000 and costs of $132.

[¶3]  Brown appeals, contending that summary judgment was improper

because (1) the State is equitably estopped from enforcing its licensing

requirements for raw milk distributors, (2) the Blue Hill ordinance exempts him

from the State's licensing requirements, and (3) he substantially complied with raw

milk labeling requirements by posting a small sign at his farm stand.  Brown also

---

[1]  Brown also suggests that unpasteurized milk is as safe to consume as pasteurized milk, that State policies favoring the pasteurization of milk are unsound, and that the State's licensing requirements for the production and sale of raw milk are unjustified.  These policy arguments are more appropriately addressed to the Maine Legislature, and we do not address them further in this opinion.

[2]  Section 2167 has been amended since the complaint was filed against Brown, P.L. 2011, ch. 535, § 2 (effective Aug. 30, 2012), but not in any way that affects this appeal.

contends that the court imposed excessive penalties against him; abused its discretion in not striking portions of the State's complaint; and abused its discretion in denying his motions to alter or amend the judgment, to stay, and for findings of fact and conclusions of law. We affirm the judgment.

## I. BACKGROUND

[¶4] The following facts are drawn from the summary judgment record and are undisputed. Brown operates a small farm in Blue Hill. Prior to 2006, Brown sold unpasteurized dairy products from his home on a limited basis. In 2006, Brown contacted the State Veterinarian to inquire about state law requirements with respect to the sale of raw, unpasteurized milk. At that time, the State Veterinarian supervised the State's Dairy Inspection Program under the Maine Department of Agriculture's Division of Animal Health and Industry. The State Veterinarian advised Brown that he did not need a license to sell raw milk so long as he did not advertise his sales. This position was apparently consistent with that taken by a previous dairy inspector who had informed dairy farmers that the unsolicited sale of raw milk did not require a license or permit.

[¶5] After consulting with the State Veterinarian, Brown spent approximately $22,000 to improve his property to produce and sell dairy products as well as food items such as canned vegetables and baked goods. From that time, Brown sold his unpasteurized milk and milk products directly to consumers,

4

without a milk distributor's license, from a farm stand located on his property and occasionally at local farmers' markets. Brown's milk products were frequently sold in containers that did not indicate that the milk products were unpasteurized. Brown did post a small 8.5-by-11-inch sign on his farm stand stating that the milk he sold was unpasteurized. Brown did not obtain a food establishment license to operate his farm stand.

[¶6] In 2009, the Department of Agriculture transferred regulation of the dairy industry from the State Veterinarian to the Division of Quality Assurance and Regulations (the Quality Assurance Division). After the change in authority, the Quality Assurance Division reviewed the statutes and rules under its regulatory authority and concluded that all persons who sell milk or milk products directly to consumers must be licensed as milk distributors, regardless of whether they actively advertise their products.

[¶7] In late 2009, the Quality Assurance Division sent a letter to all milk distributors in the state notifying them of its interpretation of the law and stating that the Quality Assurance Division would begin identifying those milk distributors operating without a license and would assist them with compliance through inspection and licensing. The fee for a milk distributor's license is twenty-five dollars for persons having annual sales or distribution of milk and milk products of less than 100,000 pounds. 1 C.M.R. 01 001 329 § 3(B) (2007). The

license fee for persons engaged in the home manufacture and sale of foods is twenty dollars. 1 C.M.R. 01 001 330 § 2(G) (2010).

[¶8] During 2011, an inspector from the Quality Assurance Division informed Brown on multiple occasions that Brown needed a license to sell milk and milk products to consumers. In September of that year, an inspector hand-delivered a letter to Brown informing him that it is unlawful to sell milk products in their final form without a milk distributor's license or to operate a food sales establishment that sold dairy products without a license. The letter further informed Brown that his milk products were improperly packaged and labeled. The letter offered to assist Brown in expediting the licensing process and included copies of the applicable laws and application forms. Brown continued to sell his products without a license to distribute milk or to operate a food establishment.

[¶9] In November 2011, the State filed a complaint in the Superior Court alleging that Brown sold milk without a milk distributor's license in violation of 7 M.R.S. § 2901-C(1), sold unpasteurized milk in containers that were not labeled "not pasteurized" in violation of 7 M.R.S. § 2902-B(1), and operated a food establishment selling dairy products without a license in violation of 22 M.R.S.

§ 2167.[3] The complaint also alleged that samples of dairy products taken from Brown's farm stand in 2011 were found to be in violation of the Quality Assurance Division's bacteria-level standards. The complaint sought an assessment of monetary penalties and injunctive relief enjoining Brown from further violations.

[¶10] In February 2012, Brown filed an answer and counterclaim in which he argued that the State's claims were barred by principles of equitable estoppel, that the sign he posted at his farm stand substantially complied with the labeling requirement for unpasteurized milk, and that an ordinance passed by the Town of Blue Hill in 2011 exempted him from State licensing requirements. In the summer of 2012, the parties filed cross-motions for summary judgment, and Brown filed a motion to strike from the State's complaint the paragraph alleging that samples of Brown's dairy products violated bacteria-level standards.

[¶11] In April 2013, the court entered a summary judgment in favor of the State on all three counts of the State's complaint and denied Brown's motion for summary judgment. The judgment enjoined Brown from selling milk without a license, selling unpasteurized milk without labeling it as such, and operating a food establishment without a license, and set the matter for a hearing regarding civil

---

[3] Pursuant to 22 M.R.S. § 2152 (4-A)(D) (2013), farm stands and farmers' markets are required to obtain a food establishment license only if they sell dairy or meat products.

penalties.[4]  Shortly thereafter, Brown filed a motion to stay the injunction pending appeal and a motion to alter or amend the judgment.  See M.R. Civ. P. 59(e), 62(a), (d).

[¶12]  In June 2013, the court held a combined hearing regarding Brown's motions and the issue of penalties.  At the conclusion of the hearing, the court imposed $132 in costs and civil penalties in the amount of $1000, consisting of $700 for two separate violations of both 7 M.R.S. §§ 2901-C(1) and 2902-B(1) and $300 for two separate violations of 22 M.R.S. § 2167.  Shortly thereafter, the court denied Brown's motion to stay and his motion to alter or amend the judgment.  Brown then filed a motion for findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(a), which the court likewise denied.  This appeal followed.

## II.  DISCUSSION

A.    Equitable Estoppel

[¶13]  Brown's principal contention on appeal is that, as a result of the State Veterinarian's statement in 2006 that Brown did not need a license to distribute milk to the public, the State is equitably estopped from requiring Brown to obtain a

---

[4] Because a farm stand that primarily sells fresh produce and not dairy or meat products is not considered a "food establishment" that is subject to licensing requirements, 22 M.R.S. § 2152(4-A)(D), the court's injunction barring Brown from operating his farm stand without a license applies only so long as he continues to sell dairy products.

8

milk distributor's license pursuant to 7 M.R.S. § 2901-C(1).[5]  In essence, Brown contends that the State Veterinarian's representations operate to forever preclude the State from requiring Brown to comply with present or future laws or regulations that the Legislature deems necessary to protect the public health and safety with respect to the sale of milk.

[¶14]  We have recognized that the doctrine of equitable estoppel may prevent a governmental entity from discharging governmental functions or asserting rights against a party who detrimentally relies on statements or conduct of a governmental agency or official. *Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630; *F.S. Plummer Co., Inc. v. Town of Cape Elizabeth*, 612 A.2d 856, 860 (Me. 1992).  To prove equitable estoppel against a governmental entity, the party asserting it must demonstrate that (1) the

---

[5] As a preliminary matter, Brown contends that he is not subject to the licensing requirements for milk distributors because he is not a "milk distributor" pursuant to 7 M.R.S. § 2900(8) (2013).  Section 2900(8) defines a milk distributor as "any person who offers for sale or sells to another person any milk or milk products in their final form."  Brown does not contest that he "offers for sale or sells to another person any milk or milk products in their final form," *id.*  Instead, Brown argues that he qualifies as a "milk producer" pursuant to 7 M.R.S. § 2900(10) (2013) because he "operates a dairy farm and provides, sells or offers milk or milk products for sale," and that the terms "milk distributor" and "milk producer" are mutually exclusive.  Brown's contention is without merit.  Brown is unquestionably a "milk distributor" as defined by the plain language of the statute, and the statute discloses no reason to ignore the common and ordinary meaning of that term.  *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 15, 868 A.2d 210 ("Unless the statute itself discloses a contrary intent, words in a statute must be given their plain, common, and ordinary meaning, such as people of common intelligence would usually ascribe to them." (quotation marks omitted)), *aff'd*, 547 U.S. 370 (2006).  Further, Brown is subject to the licensing requirements for milk distributors precisely because he sells milk products in their final form directly to consumers.  *See* 7 M.R.S. §§ 2900(8), 2901-C(1) (2013).

governmental official or agency made misrepresentations, whether by misleading statements, conduct, or silence, that induced the party to act; (2) the party relied on the government's misrepresentations to his or her detriment; and (3) the party's reliance was reasonable. *Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630; *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 34, 856 A.2d 1183; *Dep't of Human Servs. v. Bell*, 1998 ME 123, ¶ 8, 711 A.2d 1292. When reviewing a defense of equitable estoppel against a governmental entity, "we consider the totality of the circumstances, including the nature of the particular governmental agency, the particular governmental function being discharged, and any considerations of public policy arising from the application of estoppel to the governmental function." *Town of Union v. Strong*, 681 A.2d 14, 19 (Me. 1996) (citing *Me. Sch. Admin. Dist. No. 15. v. Raynolds*, 413 A.2d 523, 533 (Me. 1980)).

[¶15] Because the doctrine of equitable estoppel requires "clear and satisfactory proof," we have applied it "carefully and sparingly." *Vacuum Sys., Inc. v. Bridge Constr. Co.*, 632 A.2d 442, 444 (Me. 1993). This is particularly the case when a party seeks to apply the doctrine against a government agency. Perhaps because the vigor with which regulations are enforced is often subject to governmental discretion—which is in turn informed by policy choices, priorities, and resources—we have never applied the doctrine of equitable estoppel to bar the enforcement of a law or regulation that protects the health and safety of consumers

by placing reasonable controls on the sale of food or other consumer goods. Thus, Brown asks us to extend the doctrine of equitable estoppel beyond where we have applied it in the past.

[¶16] In light of this background, we consider whether to apply the doctrine of equitable estoppel under the totality of the circumstances presented by the summary judgment record before us. On appeal from the grant of the State's motion for summary judgment, we independently examine the parties' statements of material facts and the portions of the record referred to in those statements in the light most favorable to the party against whom judgment was granted to determine if a genuine issue of material fact exists and if the successful party was entitled to judgment as a matter of law. *Benham v. Morton & Furbish Agency*, 2007 ME 83, ¶ 13, 929 A.2d 471. Here, there is no genuine dispute that Brown sold milk and milk products to the public without a license as required by 7 M.R.S. § 2901-C(1) and that the State Veterinarian advised Brown in 2006 that he did not need a milk distributor's license to sell his milk from the farm stand on his property. We therefore review de novo the court's application of principles of equity to these facts to determine whether the State was entitled to judgment as a matter of law. *See Kondaur Capital Corp. v. Hankins*, 2011 ME 82, ¶ 17, 25 A.3d 960 ("We review the entry of a summary judgment de novo . . . ."); *Strong*, 681 A.2d at 19

("Whether the facts of a case give rise to an estoppel is a question of law for the court.").

[¶17] Based on this summary judgment record, the court did not err in determining that the State was not equitably estopped from requiring Brown to obtain a milk distributor's license. Equitable estoppel requires a misrepresentation, whether arising from misleading statements, conduct, or silence. *Pelletier*, 2009 ME 11, ¶ 18, 964 A.2d 630; *Bell,* 1998 ME 123, ¶ 8, 711 A.2d 1292. Here, there was no misrepresentation. The State Veterinarian's statements to Brown in 2006 were accurate when they were made because, at that time, the Dairy Inspection Program did not enforce licensing requirements on distributors of raw milk who did not advertise their sales. The subsequent change in policy by the Quality Assurance Division did not render the State Veterinarian's earlier statements misleading or fraudulent. Accordingly, there was no misrepresentation by a governmental entity or official that could support the application of equitable estoppel. *See Dasha v. Me. Med. Ctr.*, 665 A.2d 993, 995 (Me. 1995) ("[The defendant] made no affirmative misrepresentation, as required to support the application of equitable estoppel."); *Waterville Homes, Inc. v. Me. Dep't of Transp.*, 589 A.2d 455, 457 (Me. 1991) ("[T]he complaint lacks an allegation of the one element of a true estoppel defense that could provide a theory of relief: misconduct, e.g., fraud or misrepresentation."); *cf. City of Auburn v.*

12

*Desgrosseilliers*, 578 A.2d 712, 714-15 (Me. 1990) (concluding that equitable estoppel prevented the enforcement of a zoning ordinance because members of the City Council had affirmatively misled the nonconforming parties to violate the ordinance).

[¶18] Furthermore, even if the State Veterinarian's statements in 2006 had been misleading, the court did not err in concluding that the balancing of the equities weighs against estopping the State from enforcing its licensing requirements. *See Strong*, 681 A.2d at 19 (noting that the application of equitable estoppel against a governmental entity depends on the particular governmental agency involved, the particular governmental function being discharged, and considerations of public policy). The court determined that, under the totality of the circumstances, the public health implications of permitting Brown to sell milk without a license outweigh the injury to Brown to obtain a license.[6]

---

[6] With respect to the potential harm to Brown of obtaining a milk distributor's license, Brown contends that the court erred in finding that the maximum cost for Brown to comply with the State's licensing requirements is $300, pursuant to 7 M.R.S. § 2901-C(1). Brown asserts that this finding is incorrect because he estimated that it would cost him $62,500 to meet the standards and sanitation products for milk production and processing set out at 1 C.M.R. 01 001 329 §§ 5-6 (2007). Courts do not make factual findings in considering motions for summary judgment, however. *Alexander v. Mitchell*, 2007 ME 108, ¶ 10 n.3, 930 A.2d 1016. To the extent that there exists a genuine issue as to the potential cost to Brown to comply, the court's ultimate legal conclusion was nonetheless correct because there was no misrepresentation that could support equitable estoppel and because the balancing of the equities still weighs against estopping the State's regulation of milk products to protect public safety.

[¶19] This conclusion is supported by the important State interest in protecting the public health and welfare through milk inspection and licensing to ensure that dairy operations and sales facilities are sanitary and to minimize the health risks associated with the consumption of milk products—both raw and pasteurized—that have not been collected, bottled, or stored under safe and sanitary conditions. *See* 7 M.R.S. §§ 2900 to 2910-B (2013) (regulating milk and milk products); 1 C.M.R. 01 001 329 §§ 1-15 (2007) (establishing the procedures and standards governing the inspection, permitting, testing, labeling, and sanitation of milk and milk product production and distribution).

[¶20] The court's conclusion is also supported by our recognition that compelling policy reasons discourage applying equitable estoppel to restrict the government from undertaking its essential functions. These governmental functions may include taxing citizens, *see Fitzgerald v. City of Bangor*, 1999 ME 50, ¶¶ 13-19, 726 A.2d 1253, or pursuing child support actions, *see Pelletier*, 2009 ME 11, ¶¶ 18-19, 964 A.2d 630. The State's responsibility to protect the public health by ensuring sanitary conditions and proper business operating practices for the preparation and sale of food to the public is an equally essential function of government, and is one that militates against the application of equitable estoppel. The importance of this governmental function must also be

14

viewed in the context of this case, where the Town of Blue Hill has left the protection of public health with respect to the sale of local foods to market forces.[7]

[¶21] For these reasons, the court did not err in concluding that equitable estoppel does not bar the State's enforcement of its public-health-protection requirements that sellers and distributors of milk be licensed.

B.    The Blue Hill Ordinance

[¶22] Brown next contends that summary judgment was improper because an ordinance passed by the Town of Blue Hill exempts him from state licensing requirements for milk distributors and operators of food establishments, and by extension exempts him from the health and sanitation regulations imposed by those licensing laws.[8] In April 2011, the Town of Blue Hill adopted the Local Food and Community Self-Governance Ordinance of 2011. Blue Hill, Me., Local Food and

---

[7]    As discussed below, the Town of Blue Hill's Local Food and Community Self-Governance Ordinance of 2011 exempts producers and processors of local foods from licensure and inspection if the transaction is only between the producer or processor and a patron when the food is sold for home consumption. Blue Hill, Me., Local Food and Community Self-Governance Ordinance of 2011 § 5.1 (April 1, 2011) (the Blue Hill Local Food Ordinance). The Blue Hill Local Food Ordinance provides in its preamble: "We have faith in our citizens' ability to educate themselves and make informed decisions. We hold that federal and state regulations impede local food production and constitute a usurpation of our citizens' right to foods of their choice." Blue Hill, Me., Local Food and Community Self-Governance Ordinance of 2011 § 3 (April 1, 2011)

[8]    Brown also contends that the Blue Hill Local Food Ordinance exempts him from the labeling requirement of 7 M.R.S. § 2902-B(1) (2013) for unpasteurized milk. The ordinance makes no reference to labeling, however. See Blue Hill, Me., Local Food and Community Self-Governance Ordinance of 2011 §§ 1-11 (April 1, 2011). It is important to again note that, to the extent that Brown sells primarily produce and not dairy products from his farm stand, he is exempt under state law from obtaining a food establishment license. See 22 M.R.S. § 2152(4-A)(D).

Community Self-Governance Ordinance of 2011 (April 1, 2011) (the Blue Hill Local Food Ordinance). Section 5.1 of the Blue Hill Local Food Ordinance provides that "[p]roducers or processors of local foods in the Town of Blue Hill are exempt from licensure and inspection provided that the transaction is only between the producer or processor and a patron when the food is sold for home consumption." *Id.* § 5.1. The Ordinance applies to producers who sell their products directly to patrons at farmers' markets, roadside stands, or from their farms. *Id.* Although section 5.1 of the ordinance may be read to exempt local food producers from Blue Hill's regulations, Brown interprets the section to exempt him from State regulations as well.

[¶23] The issue of whether a State statute preempts municipal regulation is a question of law that we review de novo. *E. Perry Iron & Metal Co., Inc. v. City of Portland*, 2008 ME 10, ¶ 13, 941 A.2d 457. Maine's home rule statute grants municipalities the authority expressed in the home rule provision of the Maine Constitution[9] to "exercise any power or function . . . which is not denied either expressly or by clear implication." 30-A M.R.S. § 3001 (2013); *see E. Perry Iron & Metal Co.,* 2008 ME 10, ¶ 7, 941 A.2d 457. However, municipal legislation will

---

[9] The Maine Constitution provides: "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act." Me. Const. art. VIII, pt. 2, § 1.

be invalidated "when the Legislature has expressly prohibited local regulation, or when the Legislature has intended to occupy the field and the municipal legislation would frustrate the purpose of state law." *Perkins v. Town of Ogunquit*, 1998 ME 42, ¶ 7, 709 A.2d 106. State statutes may preempt local ordinances either expressly or implicitly. *Smith v. Town of Pittston*, 2003 ME 46, ¶ 24, 820 A.2d 1200.

[¶24] Here, the State has already "occupied the field" with respect to licensing of milk distributors and food establishments. *See* 7 M.R.S. § 2901-C(1) (providing that milk distributors may not sell, transport, or transfer milk or milk products without obtaining a milk distributor's license); 22 M.R.S. § 2167 (prohibiting the operation of a food establishment without a license). Moreover, the Blue Hill Local Food Ordinance does not indicate that its purpose is to exempt local food producers from licensing requirements imposed by state law. Rather, the Blue Hill Local Food Ordinance simply provides that "[p]roducers or processors of local foods in the Town of Blue Hill are exempt from licensure and inspection" when the transaction is only between the producer or processor and a patron. Blue Hill, Me., Local Food and Community Self-Governance Ordinance of 2011 § 5.1. When reviewing the constitutionality of an ordinance, we presume that the ordinance is constitutional and will reasonably construe the ordinance so as to avoid an interpretation that would render it unconstitutional. *Anderson v. Town of*

*Durham*, 2006 ME 39, ¶ 19, 895 A.2d 944; *Fitanides v. City of Saco*, 2004 ME 32, ¶ 10, 843 A.2d 8.

[¶25]   We construe the plain language of the Blue Hill Local Food Ordinance to exempt local food producers and processors only from municipal licensing and inspection requirements.  This regulatory decision is well within the Town of Blue Hill's authority.  *See* Me. Const. art. VIII, pt. 2, § 1 ("The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character.").  The Ordinance would be constitutionally invalid and preempted only to the extent that it purports to exempt from state or federal requirements the distribution of milk and operation of food establishments.

[¶26]  For these reasons, we construe the Blue Hill Local Food Ordinance to exempt "[p]roducers and processors of local foods" from licensing and sanitation requirements imposed by the Town of Blue Hill.  So limited, the issue of preemption is avoided.

C.    Remaining Issues on Appeal

[¶27]   Brown's remaining contentions on appeal may be addressed more expeditiously.

1.    Labeling of Unpasteurized Milk Products

[¶28]  Brown contends that the court erred in granting summary judgment on Count II of the State's complaint alleging that Brown failed to comply with 7 M.R.S. § 2902-B.  Title 7 M.R.S. § 2902-B(1) states that "[a] person may not sell unpasteurized milk or a product made from unpasteurized milk, including heat-treated cheese, unless the label on that product contains the words 'not pasteurized.'"  Brown admits that he sold unpasteurized milk and products made from unpasteurized milk without labeling them as required by section 2902-B(1), but asserts that he "substantially complied" with the law by posting an 8.5-inch by 11-inch sign at his farm stand warning, "[T]his milk is not pasteurized."  This is noncompliance, not substantial compliance, with the law's requirement that Brown affix "the label on [the] product."  *Id.*   The small sign does little to inform customers at the farm stand who might not notice it, and does nothing to inform individuals who may consume milk from the container once it has left the farm stand.  The court did not err in entering summary judgment on Count II of the State's complaint.

2.     The Court's Award of Penalties

[¶29]  Brown further contends that the court erred in assessing penalties in the amount of $1000 pursuant to 7 M.R.S. § 2908-A and 22 M.R.S. § 2167, because these statutes do not authorize the court to award penalties for each act that constitutes a violation of the State's licensing and labeling laws.[10]  Title 7 M.R.S. § 2908-A states that a person who "sell[s] milk or milk products in the State without the license or permits provided in sections 2901-C and 2902-A, [or] violate[s] sections 2901-A to 2903-B . . . commits a civil violation for which a fine of not less than $250 and not more than $500 may be adjudged."  Title 22 M.R.S. § 2167 provides that a person who operates a food establishment without a license "commits a civil violation for which a fine of not more than $500 may be adjudged for each offense."

[¶30]  We interpret the plain language of statutes to avoid absurd or illogical results.  *Sinclair Builders, Inc. v. Unemployment Ins. Comm'n*, 2013 ME 76, ¶ 10, 73 A.3d 1061.  The plain language of 7 M.R.S. § 2908-A indicates that Brown committed a civil violation every time that he sold milk without a milk distributor's license as required by section 2901-C or sold unpasteurized milk that

---

[10]  Brown also contends that the court erroneously interpreted the statutes as authorizing "per day" penalties.  This argument is without merit.  The court explicitly concluded that the statutes do not authorize penalties for each day that Brown was in noncompliance, but rather for each occurrence by which Brown violated the statutes.

was not labeled "not pasteurized" as required by section 2902-B(1). Similarly, the plain language of 22 M.R.S. § 2167 indicates that Brown committed a civil violation each time that he operated a food establishment without a license. Brown's interpretation of these statutes, which would limit the court to award one penalty regardless of the number of occurrences on which Brown unlawfully sold milk or operated his farm stand, would have the illogical result of allowing a person to continuously violate the State's licensing and labeling requirements yet be subject to minimal penalties. This result is particularly stark in the present case, where Brown refused to comply with State laws despite the State's efforts to assist him with compliance. For these reasons, the court's award of penalties was not in error.

3.    The Court's Remaining Rulings

[¶31]  Brown contends that the court abused its discretion in declining to strike from the State's complaint pursuant to M.R. Civ. P. 12(f) the paragraph alleging that samples of milk products taken from Brown's farm stand were found to have "bacteria counts ten to fifteen times greater than allowable limits." *See Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 6, 750 A.2d 577 ("We review motions to strike for abuse of discretion."). The court did not abuse its discretion in refusing to strike this paragraph from the complaint, as the paragraph was not "redundant, immaterial, impertinent, or scandalous," M.R. Civ. P. 12(f), but was

relevant to the sanitation and health concerns addressed in the compliant and to the State's request for injunctive relief.

[¶32] The court likewise did not abuse its discretion in denying Brown's motions to alter or amend the judgment, to stay, and for findings of fact and conclusions of law. *See Ten Voters of Biddeford v. City of Biddeford*, 2003 ME 59, ¶ 11, 822 A.2d 1196 ("We review the denial of motions for findings of fact and to amend or alter the judgment for an abuse of discretion."); *Cutler Assocs., Inc. v. Merrill Trust Co.*, 395 A.2d 453, 456 (Me. 1978) ("The grant or denial of the stay rests in the sound discretion of the court."). Brown argues that the court's denial of his motion to alter or amend the judgment was an abuse of discretion because the court failed to consider evidence that it would cost Brown $20,000[11] to comply with licensing requirements, which was relevant to the balancing of the equities for purposes of equitable estoppel. Because the court properly declined to apply the doctrine of equitable estoppel as a matter of law based on the undisputed facts discussed above, the court did not abuse its discretion in declining to consider evidence tendered after the entry of judgment. Furthermore, Brown's contention that the court abused its discretion in refusing to stay the effect of its injunction

---

[11]  Brown had previously asserted that it would cost him $62,500 to comply with the licensing requirements.

pending appeal pursuant to M.R. Civ. P. 62(a), (d) is rendered moot by our affirmance of the trial court's judgment.

[¶33]  Finally, Brown contends that the court abused its discretion in denying his motion for findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(a).  Because a summary judgment decides a question as a matter of law, "Rule 52(a) clearly provides no right to findings of fact in summary judgment decisions."  *Jackson v. Casco N. Bank, N.A.*, 617 A.2d 204, 205 (Me. 1992).

The entry is:

>    Judgment affirmed.

---

**On the briefs:**

> David G. Cox, Esq., The Law Office of David G. Cox, Columbus, Ohio; and Sandra H. Collier, Esq., Sandra Hylander Collier Law Offices, Ellsworth, for appellant Dan Brown
>
> Janet T. Mills, Attorney General, and Mark A. Randlett, Asst. Atty. Gen., Office of the Attorney General, for appellee State of Maine

**At oral argument:**

> David G. Cox, Esq., for appellant Dan Brown
>
> Mark A. Randlett, Asst. Atty. Gen., for appellee State of Maine

Hancock County Superior Court docket number CV-2011-70
FOR CLERK REFERENCE ONLY