STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
Civil Action
DOCKET NO. AP-15-62

FAMILY PLANNING ASSOCIATION )
OF MAINE d/b/a MAINE FAMILY )
PLANNING, )
)
Petitioner, )
v. )
)
COMMISSIONER, MAINE )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES, )
)
Respondents. )

**ORDER ON RULE 80C
APPEAL**

Before the Court is Family Planning Association of Maine's ("FPAM") Rule

80C appeal of the determination by the Department of Health and Human Services

(DHHS) that FPAM was overpaid $184,620.83. FPAM is represented by Attorney

Taylor D. Fawns of Kozak & Gayer, P.A. DHHS is represented by Attorney Thomas C.

Bradley, AAG. Oral arguement was held in the Kennebec County Superior Court on

June 6, 2017.

     I.     Background

          a.  Procedural History

FPAM began providing abortion services at its facility on Gabriel Drive in

Augusta, Maine, in April 1997. Amended Administrative Hearing Recommended

Decision ("Decision"), p. 6, August 12, 2015. FPAM entered into a "Medicaid/Maine

Health Program Provider/Supplier Agreement" ("MaineCare Provider Agreement")

with DHHS effective July 1, 1997. *Id.* at 6. The MaineCare Provider Agreement

enabled FPAM to receive reimbursement from DHHS for approved medical and

related services provided to members of the MaineCare program. *Id.* FPAM renewed its MaineCare Provider Agreement on November 4, 2003; on April 28, 2006; and on November 4, 2009. *Id.*

On November 15, 2010, DHHS's MaineCare Program Integrity Unit requested ten records of MaineCare claims submitted by FPAM for reimbursement. *Id.* On April 11, 2011, DHHS requested the records for another 100 claims from FPAM from the period of 2006-2010. *Id.* On June 24, 2011, DHHS issued a Notice of Violation against FPAM alleging that FPAM had been overpaid $188,354.73 in MaineCare billing claims based upon the 100 records of randomly selected members who received trans-vaginal ultrasound procedures through FPAM. *Id.* The four sets of violations set out in the Notice of Violation are: 1) billing abortion related ancillary services for non-covered abortions; 2) improper coding for E/M ("evaluation and management") services billed; 3) Depo-Provera billed above acquisition cost; and 4) No documentation for services billed. *Id.*

On August 23, 2011, FPAM requested informal review of DHHS's June 24, 2011 Notice of Violation. *Id.* FPAM specifically contested DHHS's findings by arguing: 1) ancillary services provided on the same day as non-covered abortion procedures are reimbursable pursuant to state and federal authority; 2) abortion patients were correctly coded as "new patients" even if they were established patients of the independent FPAM family planning practice; and 3) FPAM's Depo-Provera records demonstrate billing at acquisition cost. *Id.* On August 30, 2011, DHHS undertook a three-year review based upon FPAM's informal review request.

On October 8, 2014, DHHS issued a Final Informal Review Decision. *Id*. at 7. The Final Informal Review Decision amended a number of specific findings from the June 24, 2011 Notice of Violation, ultimately affirming the finding that FPAM was overpaid and subject to recoupment because it received MaineCare reimbursement for non-covered, abortion-related services and reducing the amount owed to $184,620.83. *Id*. The reduction of the recoupment figure was due to a reduction for properly billed Depo-Provera claims and for properly billed ultrasound procedures. There was no change of recoupment claims for abortion-related services billed, for new/established patient E/M coding, or for failure to properly document providers' identities. *Id*.

FPAM requested an administrative hearing on December 5, 2014. *Id*. Hearing was held on April 16, 2015 before Hearing Officer Richard W. Thackeray, Jr. *Id*. at 1. The Hearing Officer issued the Administrative Hearing Recommended Decision on July 24, 2015. An Amended Administrative Hearing Recommended Decision was issued on August 12, 2015. On September 3, 2015, DHHS adopted the Decision.

b. Findings of Fact

FPAM is a Maine non-profit corporation that provides family planning services at 18 facilities throughout Maine. *Id*. FPAM started providing abortion services at its first facility in April 1997. *Id*. At that time, FPAM only provided abortion procedures and ancillary services. *Id*. Pursuant to the MaineCare Provider Agreement effective July 1, 1997, and each subsequent MaineCare Provider Agreement, FPAM was able to receive reimbursement from DHHS for covered

3

medical and related services to enrolled members of the MaineCare program. *Id.* at 8.

In 1997, before entering the MaineCare Provider Agreement, FPAM administrators Evelyn Kieltyka and Amy Black met with Beth Ketch, DHHS's provider relations representative to discuss which of FPAM's services would be reimbursable under MaineCare and which billing codes should be used when submitting reimbursement claims. *Id.* The FPAM administrators expressly identified that most, if not all, of the services for which FPAM may seek reimbursement were ancillary to abortion procedures or abortion-related services. *Id.* Beth Ketch verbally advised the FPAM administrators that services including, but not limited to, office visits, trans-vaginal ultrasounds, Rh blood testing, and evaluation and management services, were reimbursable by MaineCare, and provided FPAM with coding and advice for such services.[1] *Id.*

DHHS regulations in 1997 provided that abortion services were not reimbursable through MaineCare unless the procedure was necessary to save the life of the mother, or where the pregnancy was the result of rape or incest. *Id.* At that time, the regulations did not expressly prohibit reimbursement for all services related to an unreimbursable underlying procedure. *Id.* Such a limitation was enacted by departmental regulation effective May 3, 2004. *Id.*; 10-144 C.M.R. Ch. 101, sub-Ch. II, § 90.07. No changes have been made to the abortion services specific

---

[1] The Decision included RhoGAM injections in the list of services FPAM asserts that Ms. Ketch told FPAM could be covered by MaineCare in 1997. At hearing, the parties agreed that RhoGAM injections are related to abortion procedures and are not covered by MaineCare.

language (Section 90.05-2) since May 16, 1994 and no changes have been made to Section 90.07 since May 3, 2004. *Id.*

In November 2010, DHHS's Program Integrity ("PI") Unit requested records relating to FPAM's abortion services. In April 2011, PI requested another 100 FPAM records from between 2006 and 2010. At the time of the second request for record, Ms. Kieltyka of FPAM contacted MaryAnn Anderson, the PI unit employee requesting the records. According to Ms. Kieltyka's notes, Ms. Anderson told her that there were some questions about MaineCare coverage of services provided to women on the same day that they underwent abortion procedures. Hearing Tr. 150:20-151:18.

That same day, after her conversation with Ms. Anderson, Ms. Kieltyka contacted Ms. Ketch. Ms. Kieltyka recalled Ms. Ketch confirming the 1997 guidance that services that would be provided to a pregnant woman regardless of her decision to carry the pregnancy to term were coverable on same day as an abortion procedure. Hearing Tr. 152:1-19. Ms. Ketch also suggested that DHHS would send out further guidance on services provided on the day of an abortion. No such guidance was sent to providers. Hearing Tr. 152:20, 21.

II.     Standard of Review

When reviewing the determination of a government agency, the Court looks to issues of statutory construction de novo. *Munjoy Sporting & Ath. Club v. Dow*, 2000 ME 141, ¶ 7, 755 A.2d 531. If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision. *See Sager v. Town of*

5

*Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. "An abuse of discretion may be found where an appellant demonstrates that the decision maker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id.* Ultimately, the petitioner must prove that "no competent evidence" supports the agency's decision. *Seider v. Bd. of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551 (citing *Bischoff v. Bd. of Trustees*, 661 A.2d 167, 170 (Me. 1995)). The mere fact that there is "[i]nconsistent evidence will not render an agency decision unsupported." *Id.*

Review of an agency's interpretation of statute is performed in the following manner:

> First, the court decides de novo whether the statute is ambiguous or unambiguous.
>
> Second, if the statute is unambiguous, the statute is construed directly, without deference to the agency's interpretation on the question of law. An agency cannot, by regulation, create an ambiguity in interpretation of a statute that does not otherwise exist.
>
> Third, if the statute is viewed as ambiguous, the agency's interpretation, although not conclusive, is reviewed with great deference and will be upheld unless contrary to the plain meaning of the statute.

Donald G. Alexander, Maine Appellate Practice § 8(b)(3) (4th ed. 2013); citations omitted, *citing City of Bangor v. Penobscot County*, 2005 ME 35, ¶ 9, 868 A.2d 177; *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶¶ 22-23, 895 A.2d 309; *Dep't of Corrections v. Pub. Utils. Comm'n*, 2009 ME 40, ¶ 8, 968 A.2d 1047; *S.D. Warren Co. v. Bd. Of Envrionmental Prot.*, 2005 ME 27, ¶¶ 4-5, 868 A.2d 210, *aff'd*, 547 U.D. 370, 126 S. Ct. 1843 (2006); *Kane v. Commissioner of Dep't of Health and Human Servs*,

6

2008 ME 185, ¶ 12, 960 A.2d 1196. "Only if the statute is ambiguous will we look to extrinsic indicia of legislative intent such as relevant legislative history." *Sabina v. JPMorgan Chase Bank, N.A.*, 2016 ME 141, ¶ 6; *quoting Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786.

III.    Discussion

a.    Regulation on coverage of abortion and other services

According to the MaineCare Benefits Manual ("MBM"), "reimbursement for abortion services will be made only if necessary to save the life of the mother, or if the pregnancy is the result of an act of rape or incest." 10-144 C.M.R. Ch. 101, sub-Ch. II, § 90.05-2(A). The MBM also states "when MaineCare does not cover specific procedures, all services related to that procedure are not covered, including physical, facility, and anesthesia services." 10-144 C.M.R. Ch. 101, sub-Ch. II, § 90.07. Section 90.07 was not added to the MBM until May 3, 2004. Where DHHS proves that a provider has been reimbursed for uncovered services, DHHS may recoup those reimbursements in whole or in part. 10-144 C.M.R. Ch. 101, sub-Ch. I, § 1.19-2(G).

b.    Same-Day Services

The initial question before the Court is whether the regulations support DHHS's determination that services provided by FPAM to pregnant women who are members of the MaineCare program on the day of an abortion procedure are not reimbursable by MaineCare. DHHS interpreted Section 90.07's language "when MaineCare does not cover specific procedures, all services related to that procedure are not covered", to include all services rendered on the same day as an abortion.

7

This interpretation of regulation led DHHS to find that the following services, when performed on the day of an abortion procedure, are not covered: trans-vaginal ultrasound, Rh blood testing, and office visits. FPAM argues that all of the listed services are services that may be provided to a pregnant woman regardless of whether she carries the pregnancy to term. The Court limits its determination to review of DHHS's Decision as to trans-vaginal ultrasound, Rh blood testing, and office visits provided on the same day as an abortion procedure.

FPAM contends that there is no federal or state regulation prohibiting reimbursement for medically appropriate procedures or services performed on the same day as an abortion procedure. FPAM argues that the issue before the Court is not whether services that are related to an abortion procedure are reimbursable by MaineCare; the parties agree that they are not, but instead whether services that would be provided to a pregnant woman regardless of whether she chose to carry her pregnancy to term are unreimbursable simply because they are performed on the same day as an abortion procedure. FPAM alleges that such an interpretation of the regulation is arbitrary.

DHHS argues that where the specific services of trans-vaginal ultrasound, Rh blood testing, and office visits are provided on the day of an abortion procedure, they are "related to" the abortion procedure and therefore not covered by MaineCare. Furthermore, DHHS argues that the regulation language calls for MaineCare coverage to be denied where the service is related to the uncovered procedure. DHHS contends that the regulation says nothing about covering services

8

that would be provided to pregnant women regardless of their decision to carry the pregnancy to term.

The question posed to the Court is whether DHHS may, within its discretion, interpret Section 90.07's "all services related to" to include trans-vaginal ultrasound, Rh blood testing, and office visit services performed the day of an abortion procedure. The Court must first consider the language of the regulation. *Jones v. Cost Mgmt.*, 2014 ME 41, ¶ 12, 88 A.3d 147. In this case, the "related to" language found in Section 90.07 could reasonably be interpreted multiple ways. Because the regulation is ambiguous, the Court must defer to a reasonable agency interpretation. *See Dep't of Corr. v. PUC*, 2009 ME 40, ¶ 8, 968 A.2d 1047.

The Court looks to DHHS's interpretation and application of the rule. DHHS has interpreted Section 90.07 to deny coverage for trans-vaginal ultrasound, Rh blood testing, and office visits provided on the same day as an abortion procedure because when these services are provided on the same day as an abortion procedure they are "related to" the abortion procedure, which is an uncovered procedure.

A trans-vaginal ultrasound is provided to a pregnant woman in her first office visit in order to establish how far along she is in her pregnancy. (Tr. 144:21-145:13). The information is used to determine a due date if the woman intends to carry her pregnancy to term. *Id.* Presumably, this information is also used to facilitate treatment decisions if the woman chooses to seek an abortion. *See Id.*

Rh blood testing tests for a type of protein that is attached to blood cells. (Tr. 146:24-25). Eighty-five percent of individuals have the Rh protein and are termed

9

Rh-positive. (Tr. 146:24-147:2). However, the remaining 15% do not have the Rh protein and are Rh-negative. (Tr. 147:2-4). If the woman and the pregnancy are not both either Rh-positive or Rh-negative, and if blood from both comes into contact during a miscarriage, an abortion procedure, or in carrying the pregnancy to term, there can be an antibody reaction that can cause harm to any future pregnancies. (Tr. 147:4-24).

Finally, office visits involving evaluation and management review medical history and provide a physical assessment. (Tr. 149:6-13). There is evidence in the record to support DHHS's Decision that when these services are provided on the day of an abortion procedure they are related to the abortion procedure.

The Court finds that DHHS's interpretation of Section 90.07's "related to" language to include trans-vaginal ultrasound, Rh blood testing, and office visits provided to women on the same day as an abortion procedure is reasonable. There is evidence in the record that supports DHHS's finding that each of these services is "related to" an abortion procedure when provide on the same day as the abortion. Therefore, the Court defers to DHHS's interpretation.

c. Equitable estoppel

FPAM seeks an order of the Court reversing DHHS's decision denying FPAM's equitable estoppel defense. DHHS found that FPAM could not maintain the defense because FPAM did not reasonably rely upon Ms. Ketch's statements after the rule change in 2004. Decision at p. 14. DHHS found that while reliance on Ms. Ketch's guidance was reasonable pre-May 3, 2004, it was unreasonable for FPAM to rely

10

upon Ms. Ketch's silence concerning guidance provided in 1997 after a relevant rule change. Decision at p. 13.

Equitable estoppel "is an equitable affirmative *defense* that operates to absolutely preclude a party from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." *Waterville Homes, Inc. v. Maine DOT*, 589 A.2d 455, 457 (citations omitted). "In assessing a claim of equitable estoppel against a governmental entity we consider the totality of the circumstances, including the nature of the particular governmental agency, the particular governmental function being discharged, and any considerations of public policy arising from the application of estoppel to the governmental function." *Town of Union v. Strong*, 681 A.2d 14, 19 (Me. 1996).

The elements of the defense of equitable estoppel against a government agency are: "(1) the governmental official or agency made misrepresentations, whether by misleading statements, conduct, or silence, that induced the party to act; (2) the party relied on the government's misrepresentations to its detriment; and (3) the party's reliance was reasonable." *State v. Brown*, 2014 ME 79, ¶ 14, 95 A.3d 82, 87.

FPAM points to the guidance given by Ms. Ketch in 1997 as the "misrepresentation or misleading statements" that induced FPAM to act as it did. FPAM asserts that it relied upon the guidance given in 1997, and claims that FPAM

11

is now being detrimentally penalized for its reliance by the State's recoupment. Finally, FPAM asserts that its reliance on Ms. Ketch's 1997 guidance was reasonable. FPAM asserts that DHHS consistently interpreted the regulations to allow for reimbursement for services provided to women the day of an abortion that would have been provided regardless of whether the woman chose to carry the pregnancy to term from 1997 until 2011, when DHHS began investigating. FPAM argues that it could not possibly be expected to preemptively know that DHHS's interpretation of regulation would change four years after Section 90.07 was added. FPAM contends that DHHS's change in interpretation of the regulation was arbitrary and capricious and that the Court should grant its defense of equitable estoppel.

The Court finds that FPAM's continued reliance upon guidance given in 1997 was not reasonable. Even without a rule change, relying upon guidance given 14 years earlier is not reasonable. Additionally, FPAM did not seek to clarify the guidance provided in 2004 when Section 90.07 was enacted. As a MaineCare Provider, FPAM had an obligation to keep apprised of any regulation changes and how they relate to FPAM. *See* (FPAM Ex. 1). Because there is evidence in the record to support a finding that any reliance by FPAM on the guidance provided by Ms. Ketch in 1997 after Section 90.07 was enacted in 2004 was unreasonable, the Court declines to apply the estoppel doctrine in this case.

IV.     Conclusion

The Court affirms DHHS's Decision.

Date:   6/21/17

Michaela Murphy
Justice, Superior Court

12